UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
**SELMA AL-ABBAS,**                       )
                                          )
       **Plaintiff,**           )
                                          )
                                        )    Civil No.
       v.                         )    12-11585-FDS
                                          )
**METROPOLITAN LIFE INSURANCE**           )
**COMPANY,**                              )
                                          )
       **Defendant.**           )
_____)


**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND DEFENDANT'S
MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

**SAYLOR, J.**

This is a civil action arising under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Plaintiff Selma Al-Abbas was a participant in a disability plan as part of her employment with International Business Machines Corporation ("IBM"). Defendant Metropolitan Life Insurance Company of America ("MetLife") is the claims administrator for the plan. Al-Abbas contends that she is totally disabled and cannot work at any occupation.

Al-Abbas has moved for summary judgment and defendant has cross-moved for judgment on the administrative record. For the reasons stated below, both motions will be denied and the case will be remanded to the plan administrator.

## I. Background

### A. Employment

Selma Al-Abbas received a degree in chemical engineering from Purdue University. She then began working full-time for IBM in 1984. She was initially an engineer, but eventually became an account sales representative. That position required her to sit for three to four hours per day, stand for one to two hours, walk for one to two hours (including on uneven ground), drive a car or truck, work overtime on a routine basis, occasionally lift up to 50 pounds, and travel within the United States two times per month. It allowed her some flexibility to work from home. According to Al-Abbas, the work also required extensive computer use, ability to multi-task, ability to concentrate, and presentation and communication skills.

### B. Relevant Plan Language

As part of her employment, Al-Abbas was enrolled in a long-term disability benefits plan administered by MetLife. The plan defines "disabled" as follows:

> [D]uring the elimination period [26 weeks] and the first 12 months after you complete the elimination period, you cannot perform the important duties of your regular job with IBM because of a sickness or injury. After expiration of that 12 month period, disabled means that, because of a sickness or injury, you cannot perform the important duties of any other gainful occupation for which you are reasonably fit by your education, training or experience.

(AR 944).

### C. Medical History from 1998 to February 2010

In 1998, Al-Abbas was in a motor vehicle accident. After the accident, she developed a condition that her primary-care physician, Dr. Lynn Durand, eventually diagnosed as fibromyalgia. In 2006, Al-Abbas was in another motor vehicle accident. She also began experiencing problems with her eyes, including blotchy and blurred vision in her right eye and

2

pain. She also reported difficulty sleeping, frequent light-headedness, muscle pain, and cognitive dysfunction. Opthamologist Dr. Andre d'Hemecourt and neuro-ophthalmologist Dr. Marc Dinkin both diagnosed optic neuropathy. Dr. Durand tested her for Lyme disease; the IgM Western Blot test was negative but the IgG test by IGeneX was positive. She did not definitively diagnose Lyme disease but suspected, from that point onward, that Al-Abbas's symptoms stemmed from that disease. Al-Abbas declined treatment with antibiotics in favor of alternative methods.

Throughout 2007 and 2008, Al-Abbas reported continued symptoms, such as insomnia, cognitive dysfunction, episodes of partial vision loss, tremors in her left hand, and fasciculations. However, she reported generally that she was stronger and better overall and that her neurological symptoms were improving. She underwent testing at Brigham & Women's Hospital, from which her physicians concluded that she did not have multiple sclerosis. Al-Abbas did test positive for the fungal infection known as candidiasis, for which she received treatment by medication and by altering her diet.

In the fall of 2009, Al-Abbas began experiencing greater difficulty walking, along with cramping, heart palpitations, insomnia, fatigue, and tremors. She reports that her family members, friends, and neighbors took over cooking, cleaning, and shopping because she no longer could complete those tasks. Dr. Durand treated her for chronic fatigue and immune deficiency syndrome.

In February 2010, Al-Abbas reported increased symptoms, much worse than those she had experienced prior to this period. The record suggests that in this time period, IBM allowed Al-Abbas some accommodations, such as telecommuting, so that she could continue working.

### D. Medical History from February to August 2010

On February 27, 2010, Al-Abbas took a medical leave of absence from IBM. At the time, she reported symptoms including numbness in her extremities and buttocks, generalized weakness, insomnia, jerking and tremors, heart palpitations, sensitive skin with a burning sensation, fatigue, dizziness, difficulty thinking, ear pain, night sweats, anxiety, hair loss, weight loss, and a purple left toe. She also developed a sensitivity to smells and chemicals. As a result, she had difficulty typing, walking, grasping, and carrying on a conversation, and could not drive a car or watch television.

Al-Abbas saw a number of physicians, who performed variety of tests in an attempt to determine a diagnosis. An MRI revealed no evidence of hemorrhage, infarction, or other abnormality that would explain her symptoms; there were no abnormalities in her cervical spine; an EKG test and holter monitor measured results within normal limits; and a lumbar puncture found no evidence of demyelinating disease. Dr. Durand continued to believe that Al-Abbas had active chronic Lyme disease, and thought it was the cause of her fatigue and autoimmune symptoms. Ultimately, Dr. Mark Biletch, a neurologist, remarked that it was "challenging" to come up with a "unifying diagnosis." (AR 500).

Dr. Durand referred Al-Abbas to other physicians and specialists. Dr. Biletch noted that she was anxious and somatically oriented, but that she was attentive and oriented and that her language and speech were normal. Neurologist Dr. Ann Cabot described her as symptomatic but neurologically stable, and observed that she had fluent and coherent language, no difficulty finding words, no tremor or atrophy, and no cognition problems. Neurologist Dr. Keith McAvoy noticed a mild optic pallor in her right eye and hand tremors, but likewise reported that she was

4

alert and oriented and that she could squat and stand without use of her hands and walk with steady gait. Dr. McAvoy stated that she was quite strong despite the generalized weakness she reported and that he felt that there was a discrepancy between the results of her neurological examination and her subjective symptoms.

At various points, Al-Abbas took Trazodone, Ambien, and Gabapentin for her symptoms. Dr. Laura Riley Jones, a specialist in naturopathy, prescribed homeopathic remedies as well. Al-Abbas also attended counseling for insomnia and depression. She also did yoga, breathing, and meditation exercises, tried to walk for one mile two to three times per week, and maintained a healthy diet.

On August 14, 2010, Dr. Durand wrote, "I do feel that at this point she is totally disabled. He[r] symptoms are subjective but I think that they are real and disabling." (AR 461). Dr. Durand completed a form for IBM and MetLife regarding Al-Abbas. The primary diagnosis recorded on the form is an "undiagnosed neurological condition," which Dr. Durand indicates she believes is probably "related to Lyme disease." The secondary diagnoses are optic neuritis and fibromyalgia. Under "Objective Findings," Dr. Durand listed only "tremors," but also noted subjective symptoms of palpitations, eye pain, fatigue, and diffuse pain. She noted physical limitations in walking; assuming cramped or unusual positions; pushing, pulling, and twisting; grasping and handling; finger dexterity; repetitive movement; climbing; balancing; bending, stooping, and squatting; and concentrated visual attention. She noted that Al-Abbas could never lift more than 31 pounds and could lift up to 30 pounds less than 20% of the time. She recommended that Al-Abbas avoid operating a truck, heavy equipment, or electrical equipment. Dr. Durand concluded that her physical impairments left her capable of "light work" and that she

had no mental impairments. Overall, Dr. Durand opined that Al-Abbas was totally disabled for her own occupation, but stated that she could not determine whether she was disabled for "any occupation." (AR 798-99).

### E. Medical History after August 2010

Over the six months following the August 14, 2010 visit, Al-Abbas's condition temporarily improved. Dr. Durand noted in September 2010 that she was sleeping better, gaining strength in her neck, and "improving overall." In February 2011, Dr. Durand noted that she was "generally doing better than one year ago." As of April 2011, however, Al-Abbas reported experiencing muscle pain, tightness and stiffness, weakness in her extremities, eye pain and pressure, numbness on her face, insomnia, fatigue, heart palpitations, jerking and twitching, chemical sensitivities, and cognitive dysfunction. Dr. Durand conducted a tender point test in May 2011 and, finding 16 or 18 points tender, diagnosed fibromyalgia. Dr. Durand also noted, however, that Al-Abbas was well groomed and neatly dressed, had appropriate mood and affect, maintained good eye contact, and displayed good speech and thought processes. In July, opthamologist Dr. Donahue stated that Al-Abbas had a mild loss of her right visual field, but that it was not an active concern or a basis for a finding of disability.

Dr. Jones's records show a similar progression. Al-Abbas reported to her that her symptoms improved to the point where, in November 2010, she stated that she was thirty to forty percent better. In March 2011, however, she stated that her face and feet were numb, her limbs continued to jerk, her strength remained weaker, and her pain was the worst it had been in eight to nine years. On March 18, 2011, Dr. Jones wrote a letter stating that Al-Abbas had multiple chemical sensitivities, which made it difficult for her to function in various social settings, and

6

that although she had seen improvement in her condition, she was "not able to work due to the debilitating symptoms involved with her [progressive neurological] condition." (AR 719).

Al-Abbas underwent more diagnostic tests. She tested negative for mitochondrial disease, had normal pulmonary function, and did well in neuropsychological testing. As before, no medical professional made a definitive diagnosis. Dr. Jeffrey Cohen remarked, "It is hard to ascertain an underlying etiology." (AR 639).

In May 2011, Al-Abbas began physical therapy for physical ailments and pain. Lynne Ainsworth, the physical therapist, noted that she experienced pain when reaching, pushing, and lying on one side. Over the course of two months, she made slight gains in range of motion and reported decreased pain and increased energy. In August 2011, Ainsworth noted that she had significant functional limitations because of the pain in her shoulders.

### F. Functional Capacity and Vocational Analysis

In June 2011, Al-Abbas underwent a functional capacity evaluation ("FCE") at Spaulding Rehabilitation Hospital to determine her ability to work. Occupational therapist Gail Breeze found that she was within functional limits for standing, balancing, squatting, kneeling, walking, gross dexterity, and handwriting, but that she was unable to perform overhead reaching and was impaired in fine dexterity, upper and lower extremity strength, range of motion, and flexibility. Breeze also remarked that the observed facial affect and movement patterns were consistent with her reported pain level of 6 out of 10 and that Al-Abbas appeared to give full effort during the evaluation. She recorded that Al-Abbas could tolerate thirty minutes of typing before experiencing pain in her neck and numbness in her hands. Breeze concluded that Al-Abbas had reduced endurance for the work day and recommended that she consider an interdisciplinary

7

pain-management program to help her maximize her work and functional capacities.

In July 2011, Al-Abbas underwent a vocational analysis by James Parker at the request of her attorney. After reviewing her medical records, Parker noted that Al-Abbas was limited in her ability to stand and walk for the amount of time required for light or sedentary work; that her visual problems and impaired fine motor skills limit her ability to utilize computers and other technology; that her fatigue and inability to maintain a position for an extended period would prevent her from sustaining any work on a regular and predictable basis; and that her impaired cognition would not allow her to concentrate and analyze at the level required by her job. Parker concluded that Al-Abbas was "totally disabled from all work for which she could reasonably qualify by education, training, and experience and will remain so for the foreseeable future." (AR 168).

### G. Application for Disability Benefits and Appeal

After Al-Abbas took medical leave on February 27, 2010, IBM provided her with short-term disability benefits for six months, through August 28, 2010.

Al-Abbas then applied for long-term disability benefits. MetLife referred the claim to a consultant, Dr. Derrick Bailey, for review. He concluded that "there is no evidence of a condition causing any functional limitations since the evidence is primarily subjective self report." (AR 761). Dr. Bailey further stated, "It is not clear what this new condition is and the claimant has been working with her fibromyalgia." (*Id.*). MetLife then denied the application.

Al-Abbas appealed the denial within MetLife. Among other things, she submitted her medical records and affidavits from herself, her spouse, a friend, and her massage therapist. Her husband, David Getzin, noted changes that he had observed over the previous few years. He

8

wrote that she could no longer take long bicycle rides, camp, hike, garden, train the family's dogs, or converse about politics as she used to enjoy doing. He stated that she had difficulty with comprehension and memory, and that she could no longer drive, cook, or care for herself. A friend stated that Al-Abbas had changed from an energetic, hard-working, bright woman who excelled in her career to a "frail" and "weak" individual.

In adjudicating the appeal, MetLife sought the opinions of two independent physician consultants. Both consultants reviewed Al-Abbas's medical records from February 27, 2010 onward. The consultants also attempted to obtain additional information from her physicians, most of whom reportedly did not return their calls. One of the consultants, Dr. Siva Ayyar, an occupational therapist, noted that Al-Abbas was receiving appropriate care and treatment, was compliant with treatment, and that she had an "entirely negative and thorough workup for her nonspecific symptoms." (AR 135). He concluded that there "is no basis for her long-term disability claim during the timeframe in question." (AR 136). The other consultant, Dr. Keven Murphy, a neuropsychologist, remarked that there were no psychiatric, psychological, or neuropsychological reports in the file and that he could not conclude whether Al-Abbas was receiving appropriate care, whether she was compliant, and whether she had any mental limitations.

On September 1, 2011, MetLife upheld its denial of her claim. Its decision first highlighted the opinions of Drs. Ayyar and Murphy that Al-Abbas suffered no physical or mental impairments and then reiterated their summaries of the medical records. It concluded that "although Ms. Al-Abbas had medical conditions noted by her providers, there was insufficient medical evidence that these conditions were of such a severity as to prevent her from functioning

9

at her regular job from February 27, 2010 continuously to the long term disability start date of August 28, 2010 onward." (AR 29).

On April 17, 2012, the Social Security Administration approved Al-Abbas's claim for disability benefits, establishing a disability date of February 27, 2010.

### H. Procedural History

On August 24, 2012, Al-Abbas filed a complaint in this Court, alleging unlawful denial of benefits under ERISA. On February 14, 2014, MetLife moved for judgment on the administrative record, and Al-Abbas cross-moved for summary judgment.

## II. Standard of Review

On a motion for summary judgment in an ERISA benefit-denial case, "the non-moving party is not entitled to the usual inferences in its favor." *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005). Instead, "summary judgment is simply a vehicle for deciding the issue." *Id.* The role of the district court in an ERISA benefit denial case is to "sit[] more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Leahy v. Raytheon Co.*, 315 F.3d 11, 17-18 (1st Cir. 2002). That determination is reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When the plan administrator has been granted such discretion, its decision must be upheld unless it is arbitrary, capricious, or an abuse of discretion. *Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Associates Long Term Disability Plan*, 705 F.3d 58, 61 (1st Cir. 2013). The court may not

"substitute its judgment" for that of the plan administrator. *Motor Vehicle Mfgrs. Ass'n Vehicle Mfgrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). Instead, it must uphold the determination "if reasonable." *Conkright v. Frommert*, 559 U.S. 506, 508 (2010) (citation and quotation omitted).

An administrator's decision is "reasonable" if it is "reasoned and supported by substantial evidence." *Colby*, 705 F.3d at 62 (citation omitted); *Gannon v. Metropolitan Life Ins. Co.*, 360 F.3d 211, 213 (1st Cir. 2004). The existence of contrary evidence in the record does not, standing alone, render an administrator's decision arbitrary. *Tsoulas v. Liberty Life Assurance Co. of Boston*, 454 F.3d 69, 78 (1st Cir. 2006) (citing *Gannon*, 360 F.3d at 213). However, a plan administrator may not "cherry-pick the evidence it prefers while ignoring significant evidence to the contrary." *Winkler v. Metro. Life Ins. Co.*, 170 F. App'x 167, 168 (2d Cir. 2006); *Petrone v. Long Term Disability Income Plan for Choices Eligible Employees of Johnson & Johnson & Affiliated Companies*, 935 F. Supp. 2d 278, 293 (D. Mass. 2013).

The presence or absence of a structural conflict—where the plan administrator both makes eligibility determinations and pays out benefits—is a relevant factor to be considered in an ERISA review. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008). However, the presence of a structural conflict does not alter the "arbitrary or capricious" standard of review. *Denmark v. Liberty Life Assurance Co. of Boston*, 566 F.3d 1, 8 (1st Cir. 2009).

**III.     Analysis**

After a review of the record, the Court concludes that MetLife abused its discretion in its evaluation of plaintiff's claim. The decision did not adequately address contrary evidence in the record and placed undue weight on the lack of a "unifying diagnosis." Those errors, taken

together, render the denial of benefits unreasonable. The errors, however, are procedural, not substantive. Under the circumstances, it is not appropriate for this Court to rule on the merits of the dispute. Instead, the appropriate course of action is to deny both motions and remand to the plan administrator for reconsideration. *See Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 31 (1st Cir. 2005).

### A. <u>Failure to Address Contrary Evidence</u>

The mere existence of contrary evidence in the record is not sufficient to render a determination arbitrary and capricious. *Leahy*, 315 F.3d at 18-19. However, a plan administrator may not "simply ignore contrary evidence, or engage with only that evidence that supports his conclusion." *Petrone*, 935 F. Supp. 2d at 293 (citing *Winkler*, 170 F. App'x at 168). Here, MetLife's determination letter lists the evidence that defendant reviewed. It does not, however, fully engage with the substantial and objective evidence of plaintiff's functional limitations.

First, MetLife's determination mentions the FCE in passing, but does not address its conclusions that plaintiff is impaired in fine dexterity, range of motion, upper- and lower-body strength, overhead reaching, and endurance. Nor does it provide any reason for rejecting those conclusions.[1]

Second, there is no discussion of Parker's vocational assessment report, other than a brief mention in the list of evidence "reviewed." The letter provides no explanation as to why that report—which describes functional limitations that would prohibit plaintiff performing her

---

[1] Plaintiff argues that defendant violated its own internal guidelines about consideration of such examinations. The guidelines describe FCEs and their utility, but do not require decision makers to accord them specific weight. It appears, therefore, that those guidelines were not violated.

job—is not entitled to any weight. Nor does the letter acknowledge Parker's conclusion that plaintiff was "totally disabled from all work for which she could reasonably qualify by education, training, and experience and will remain so for the foreseeable future." (AR 168).

Third, the letter fails to "engage with" Dr. Durand's findings to the degree required. *See Petrone*, 935 F. Supp. at 293. The only reference in the letter appears at page 27: "Dr. Durant [sic] noted that her affective and cognitive status appeared normal at the time of [an April 2011] visit." The determination letter appears to give no weight to the remainder of Dr. Durand's records or her diagnoses, even though the medical evidence, in Dr. Durand's opinion, provided objective evidence of tremors, insomnia, and strength that produced functional limitations.[2]

Defendant correctly notes that under ERISA, unlike in Social Security law, no special deference is due to the treating physician. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003).[3] And, of course, the plan administrator is not required to accept any of the treating physician's conclusions, particularly if those conclusions are outside, or on the fringes of, the physician's expertise. However, a plan administrator cannot simply disregard the conclusions of plaintiff's primary-care physician of more than ten years. *See Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 397-98 (7th Cir. 2009) ("While plan administrators do not owe any special deference to the opinions of treating physicians, they may not simply

---

[2] MetLife's letter also appears to disregard other contrary evidence, such as the physical therapist's record of limited range of motion (which may be objective evidence of physical limitations) or Dr. Jones's record of dark circles under plaintiff's eyes (which may be objective evidence of insomnia). It also did not address the fact that none of her physicians or other medical professionals suggested that she was malingering or faking her illness. In fact, those who tested her remarked that she appeared to give her full effort, and her physicians continued to prescribe medications to treat her, from which it may be inferred that they credited her reported symptoms.

[3] Plaintiff notes that the Social Security Administration granted her disability benefits on April 17, 2012, retroactive to February 27, 2010. The Social Security Administration's decision is not binding on disability insurers. *See Boardman v. Prudential Ins. Co. of Amer.*, 337 F.3d 9, 14 n. 4 (1st Cir. 2003). While such decisions should not normally be ignored, the SSA awarded plaintiff benefits on a date later than defendant's determination of the appeal.

13

ignore their medical conclusions or dismiss those conclusions without explanation.").

In sum, the determination made by the plan administrator is unreasonable because the administrator failed to address substantial contrary evidence in a meaningful way. Again, the plan administrator can reject that evidence, but it cannot simply ignore it. Remand to the plan administrator for reconsideration of the full record is therefore appropriate.

### B. Placement of Undue Weight on Certain Evidence

Under the abuse-of-discretion standard of review, the role of the court is not to second-guess the plan administrator's weighing of the evidence. *Vlass v. Raytheon Employees Disability Trust*, 244 F.3d 27, 32 (1st Cir. 2001). However, if the administrator has placed undue and improper weight on certain types or pieces of evidence, the resulting determination may be arbitrary and capricious. *See Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 761 (7th Cir. 2010). Mischaracterization of evidence can also justify a remand for further review. *Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 29 (criticizing a report that claimed to have found a consensus in the medical records, where in fact no consensus existed).

Neurological conditions, such as fibromyalgia, are notoriously difficult to verify objectively, and administrators cannot deny benefits simply on the basis that the claimant cannot be definitively diagnosed. *Denmark v. Liberty Life Assurance Co. of Boston*, 481 F.3d 16, 37 (1st Cir. 2007), *vacated on other grounds*, 566 F.3d 1 (1st Cir. 2009). When certain illnesses do not "lend themselves to objective clinical findings," the proper approach is to consider "the physical limitations imposed by the symptoms of such illnesses [that] do lend themselves to objective analysis." *Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 17 n.5 (1st Cir. 2003).

MetLife's determination appears to rely heavily on the absence of a definitive diagnosis for plaintiff's neurological symptoms. One consultant's conclusion was summarized as follows:

"Ms. Al-Abbas *simply* had nonspecific symptoms without a specific unifying diagnosis that would account for said symptoms." (AR 28) (emphasis added). After proceeding to list diagnoses that had been ruled out, the denial letter stated: "Other than this isolated episode of optic neuritis four years ago, Ms. Al-Abbas did not have any objectively verifiable diagnoses that would account for her symptoms. There was no factual basis for her long-term disability claim." (AR 28). Again, the focus should properly have been on her functional limitations, if any, not the specificity of her diagnosis.

The plan administrator also appeared to place unwarranted emphasis on isolated statements by physicians that plaintiff's subjective complaints are not supported by objective testing. The demand letter stated, "Many neurologists commented that Ms. Al-Abbas' subjective complaints outweighed objective findings . . . ." (AR 28). It is certainly true that some of the medical records describe plaintiff as having greater mental faculties and physical capacities than she herself reported. For example, she complained that she had difficulty walking, but doctors observed no problems with her gait, and complained that she suffered cognitive dysfunction, but was able to speak clearly and communicate effectively. On the other hand, the statement that "*many* neurologists commented" on the discrepancy is a mischaracterization. The record reveals only two overt comments. Dr. Durand noted that plaintiff's cognitive dysfunction was "subjective" because neuropsychological testing found her within normal limits. (AR 438). And Dr. McAvoy reported that plaintiff "describe[d] generalized weakness" but was "actually quite strong on examination." (AR 472). It is entirely appropriate for the plan administrator to weigh subjective and objective evidence of functional limitations, and it is free to reject or discount particular items of evidence. But the determination here draws a conclusion about plaintiff's credibility that is not supported in the record as a whole; as noted, plaintiff's physicians never

15

suggested that she was malingering or exaggerating her illness.

Considered in conjunction with the errors noted above, the determination is unreasonable. Remand for further review is therefore appropriate.

### C. Additional Considerations

Plaintiff further contends that defendant abused its discretion by failing to evaluate her disability against the specific requirements of her occupation. Indeed, some courts have held it "essential" for a plan administrator to "consider whether the claimant can actually perform the specific job requirements of a position." *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 855 (3d Cir. 2011).

Plaintiff is correct that the decision letter contains no specific mapping of her particular limitations to her particular occupational duties. However, plaintiff's job description is not of a type that would add significant complexities to an analysis of total disability. Her job primarily involved sitting, with some minimal standing and walking and occasional lifting. Plaintiff has also worked from home since 1998. While those facts, by themselves, are not proof that plaintiff is capable of performing her occupation, it does cut against the argument that her specific job duties required more direct analysis within the disability determination. *Cf. Doe v. Unum Life Ins. Co. of Am.*, No. 12–11413, 2014 WL 3893096, at *8 (D. Mass. Aug. 8, 2014) (finding a plan administrator's decision to be arbitrary and capricious in part because the review did not consider the unique demands of plaintiff's "stressful" job).

In any event, the other shortcomings of the denial letter, as detailed above, are sufficient to warrant remand. For that reason, the Court does not decide whether MetLife's failure to compare plaintiff's abilities directly to her job description would be an independent ground for

remand.[4]

Considering the record as a whole, defendant's review of plaintiff's claim fails arbitrary and capricious review for essentially procedural reasons. "The problem is with the . . . decision-making process." *Buffonge*, 426 F.3d at 31. Those failures in the decision-making process amount to an abuse of discretion, and necessitate a remand for further review.

## IV.    Conclusion

For the foregoing reasons, plaintiff's motion for summary judgment is DENIED and defendant's motion for judgment on the administrative record is DENIED. The case is remanded to the plan administrator for further review in accordance with this decision.

**So Ordered.**

                                                  /s/ F. Dennis Saylor
                                                  F. Dennis Saylor IV
                                                  United States District Judge

Dated: September 30, 2014

---

[4] The Court notes the existence of a structural conflict in this case, as MetLife acts as both the claim administrator and the insurer for IBM's long-term disability plan. The Supreme Court has held that the presence of a structural conflict is a relevant factor to be considered in analyzing an administrator's determination, although it does not alter the standard of review. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 108, 115 (2008). The degree to which a structural conflict should influence a court's analysis depends on the specific circumstances, including whether "an insurance company administrator has a history of biased claims administration" and whether "the administrator has taken active steps to reduce potential bias and to promote accuracy." *Id. at 117*. The parties have not advanced significant evidence on these points, and so the Court cannot fairly evaluate the extent to which MetLife's structural conflict may have affected its decision. Accordingly, the decision to remand does not depend on any factor related to the structural conflict.